IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHANDA S. KILLEN :  CIVIL ACTION
        :
   v.     :
        :
NORTHWESTERN HUMAN SERVICES, :
  INC., et al.    :  NO. 06-4100

FILED
SEP - 7 2007
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

MEMORANDUM

Dalzell, J.         September 7, 2007

    Shanda Killen has sued her former employer[1] claiming racial discrimination, harassment, retaliation, and intentional infliction of emotional distress. Defendants have filed a motion for summary judgment on all counts.

## I. Factual History[2]

    Shana Killen is a married, dark-skinned African-American woman. In November of 1999, NHS, a provider of outpatient and residential services for patients with mental health diagnoses, hired Killen as a site supervisor. In June of

---

    [1] Killen worked for Northwestern Human Services of Delaware County, Inc. She has also sued its parent company, Northwestern Human Services, Inc. Because the record does not disclose a difference in the legal theory supporting Killen's claims against the two defendants, and because neither party argues that such a difference exists, we will simply refer to them collectively as NHS.

    [2] As we are addressing NHS's motion for summary judgment, we construe any disputed facts in the light most favorable to Killen. Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir. 1999).

2000, NHS promoted her to Personal Care Home Administrator, the position she held until her termination. In that capacity, Killen supervised the staff of two personal care boarding homes in Delaware County, Aston House ("Aston")[3] and Sylvan House ("Sylvan"). She supervised about fifteen staff, including the administrators of the two facilities, Geoffrey Kulo at Aston and Kim Webb at Sylvan. In March of 2004, NHS named Carol Schlemmer its Director of Adult Specialized Services. In that position, Schlemmer was Killen's direct supervisor at all times relevant to this lawsuit.

In October of 2004, NHS promoted Celestine Washington to Director of Client Funds. Washington is a light-skinned African-American woman with green eyes. Washington's primary job was to standardize the financial practices among the various NHS facilities in the Eastern Region, including Sylvan and Aston. At the time of Washington's promotion, NHS Philadelphia had written policies in place, but most of the other facilities lacked written protocols and the policies were not standard across the region. These financial policies are important because administrators of residential facilities sometimes serve as representative payees for residents' Social Security payments.

---

[3] In the filings, Aston is sometimes referred to as Gentlemen's Home.

In addition to standardizing procedures, Washington conducted informal audits of the client funds being handled at various sites.

On March 28, 2005, Schlemmer received two anonymous[4] phone calls expressing concern about the possible mishandling of client funds at Sylvan.  Schlemmer called Cathy DiRusso, the unit director, and they agreed that, as a first step in the investigation of these allegations Washington should conduct a client funds audit[5] as part of her visit to Sylvan.

On April 19, 2005, Schlemmer called Killen and asked her to meet Washington at Sylvan for the audit.  The audit lasted about three days during which time Schlemmer, Kulo, and Webb were sometimes present.  Killen and Washington were together for a full eight-hour day each of those three days.  During the audit, Killen alleges that Washington "continuously subjected [her] to racially harassing and offensive behavior."  Pl. Resp. at 5.

---

[4] Although the second call was from the mother of a resident at Sylvan House, it was made at the behest of someone who had called that person anonymously.  Schlemmer Dep. at 84:5-13.

[5] Washington is not a Certified Public Accountant (indeed, she is not a college graduate, see Washington Dep. at 33:17-34:12), so this should not be understood to have been a formal financial audit.  Because, however, the deponents and parties uniformly refer to Washington's activities as an "audit," we will do the same here.

3

Those comments included Washington's observation that, because of her dark skin, Killen "didn't fit the mold to be in the corporate world." Killen Dep. at 124:12-15.[6] Some, but not all, of the comments were made in the presence of Kulo and Webb and comments were made both during the audit itself and over lunch. During those same conversations, Killen said "because I am fat and black and have dreads, I will never make it to corporate" and told Washington that her husband had Washington's complexion and could pass for Spanish. Id. at 155:24-156:14.

Some time between April 22 and May 2, 2005 Killen reported these comments to Leah Pason, an investigator with the compliance department at NHS. She also reported them to other unnamed members of the compliance department and to various

---

[6] Although Killen's complaint alleges other comments and Killen testified that "[t]here were so many offensive comments I am not sure [which comments were made on which days]," Killen Dep. at 129:19-20, this is the only specific comment of which Killen herself presents record evidence. Washington's testimony, however, contains reference to additional comments: that she [Washington] "fit the corporate profile" because of her lighter skin and green eyes; that black individuals and white individuals should not date; discussion of romantic interest in a particular black employee; that she [Washington] considered herself superior to darker-skinned blacks and that she always got her way with management; and that her supervisor, who was Asian, only got his position because he had a masters' degree. Washington Dep. 101-06. These same comments (and an allegation that Washington "smuggled products from an endangered animal from the Cote d'Ivoire past customs") are mentioned in the report of NHS's investigation into Killen's allegations. Def. Mem., ex. G at 487.

corporate officials.  In addition, she made an anonymous report of the comments to an NHS hotline on May 27, 2005.  NHS began an investigation, and on June 24, 2005 it concluded that Killen's complaint against Washington was unfounded.  Def. Mem., ex. G at 495.

During the audit, Washington raised questions about Killen's creation of a contingency fund for some residents.  This fund deducted thirty-five dollars from each resident's rent and set it aside in a vacation fund for that resident.  Killen asked Schlemmer about starting such a fund shortly after Schlemmer became her supervisor and Schlemmer told her to go ahead.  Id. at 516.  The monies set aside were stored in cash in a safe.  Killen was not the only administrator to create such a contingency fund for her clients, although monies were typically placed in a bank account rather than being held in cash.  When Washington audited the fund, she found no evidence that any money was missing from the contingency fund.

Washington also raised doubts about some of the procedures for allowing residents to withdraw money from their own accounts.[7]  In particular, there was a question about the

_____

[7] At least two residents at Aston had accounts at outside banks that NHS staff controlled.

allocation of a $12,190.33 Social Security check that had been wired to the account of LB, a resident at Aston.

On June 8, 2005, Schlemmer, in consultation with her supervisors, made the decision to place Killen on leave pending a complete investigation of Washington's findings.  Washington had no role in this decision.  NHS's human resources approved the decision on June 10, 2005.  There is no evidence that Schlemmer was aware of Killen's claim that Washington had harassed her at the time NHS decided to place Killen on leave, .

Also on June 10, Schlemmer received two more phone calls raising questions about Killen's handling of LB's Social Security check.  One of the calls was from Brett Carrick of the guardian office at Norristown State Hospital.  The other was from Dottie Johnson, who identified herself as an acquaintance of Killen's.[8]

------

[8] Because the actual content of those conversations is hearsay, we may not consider the specific allegations Carrick and Johnson made.  See Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996) (limiting evidence considered in support of summary judgment to that "capable of being admissible at trial") (quoting Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).  We therefore include in our recitation of the facts only the calls' existence for the limited purpose of explaining Schlemmer's decision to investigate Killen's handling of the check more thoroughly.

On June 13, 2005, NHS notified Killen that she was being placed on administrative leave.  On that same day, Killen told Schlemmer directly of Washington's allegedly discriminatory behavior.[9]  The letter placing Killen on leave explained that, if the investigation concluded that the allegations were unfounded, she would be returned to her position and paid for the intervening time.  If, on the other hand, the investigation found that there were accounting irregularities, she would not be paid for her time on leave and appropriate action would be taken regarding her employment status.  At the time NHS placed her on leave, Killen had not seen Washington's complete written report.  That evening, Killen made another anonymous call to the NHS compliance hotline, this time complaining that she had been placed on administrative leave in retaliation for her complaint about Washington.

Kevin Dougherty is NHS's Director of Internal Audit[10] and was responsible for the formal investigation into Killen's financial practices.  Dougherty never had a face-to-face meeting with Killen, apparently because they were unable to find a time when she was available.  Def. Mem., ex. K at 155.  Dougherty also

---

[9] It is not clear from the record which of these two events happened first.

[10] Unlike Washington, Dougherty is a CPA.

did not speak with Kulo, who worked closely with Killen at Aston House, although he did read an interview with Kulo that the compliance department had prepared.  Dougherty filed a written report on July 16, 2005.

Dougherty's report found undocumented disbursements of $2,330 from one resident's account.  Killen provided Dougherty with signed statements from staff attesting that the resident himself spent this money, but these statements were signed after the audit began.[11]  Dougherty's report also raised concerns about Killen's disbursement of the $12,190.33 Social Security payment to LB.  After that check was deposited, the bank issued ten $1000 cashier's checks.  These were all cashed during the month of August, 2004.  Seven thousand dollars of that money was used to pay a balance LB owed to Norristown State Hospital.  The remainder, according to Killen's log, was used for five trips to Atlantic City, two trips to the Philadelphia Zoo, and regular trips to Penn's Landing (even during January and February).  Schlemmer reported that she believed the log was created in June, 2005, well after the money was spent.

---

[11] Dougherty also found that Killen coerced the staff into signing these statements, but his basis for such a conclusion is not clear.

8

Dougherty's report also found $36,183 in rent payments for three residents at Sylvan that were never received at the NHS office in Broomall, Pennsylvania.  Webb also reported that she had provided rent checks totalling $5,978 to Killen shortly before Killen was placed on administrative leave.  Those checks were also not received at the Broomall office.  In total, the report found more than $49,000 that was unaccounted for and suggested that NHS might want to consider legal action or contact law enforcement.

After receiving Dougherty's report, William DiGeorge, Schlemmer's supervisor, and Stephen Miller, Director of Human Resources, made the decision to terminate Killen.  On September 19, 2005, Schlemmer sent Killen a letter notifying her that her employment had been terminated retroactive to the date she was placed on administrative leave.  On November 3, 2005, Killen filed a charge of discrimination with the Equal Employment Opportunity Commission.  She received her right to sue letter on June 19, 2006 and filed this action on September 12, 2006.

## II.  __Analysis__

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In resolving a motion for summary judgment, the Court must draw all reasonable inferences in the non-movant's favor, Bartnicki, 200 F.3d at 114, and determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where, as here, the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if admissible, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Killen's complaint raises three counts: discrimination on the basis of race under Title VII of the Civil Rights Act of 1964, intentional infliction of emotional distress, and violation of the Pennsylvania Human Relations Act.[12] Under Title VII, she makes, in essence, three separate claims: a disparate treatment claim under 42 U.S.C. § 2000e-2(a); a hostile environment harassment claim under 42 U.S.C. § 2000e-2(a), which was

---

[12] Because the same legal standards apply to Killen's PHRA claim as apply to her Title VII claim, Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005), we do not address the state law claim separately.

construed to encompass hostile environment claims in <u>Harris v.</u>
<u>Forklift Sys.</u>, 510 U.S. 17 (1993); and a retaliation claim under
42 U.S.C. § 2000e-3(a).  We will address each of her claims in
turn.

    A.   <u>Disparate Treatment</u>

    A plaintiff seeking to prove disparate treatment may
either offer direct evidence that demonstrates an impermissible
bias or may proceed under the burden-shifting framework of
<u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas</u>
<u>Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981).  Killen,
like the vast majority of Title VII plaintiffs, has elected to
proceed under the <u>McDonnell-Douglas</u> burden-shifting framework.
Under that approach, Killen must first prove a <u>prima</u> <u>facie</u> case
of discrimination.  To do so, Killen must show that:  (1) she is
a member of a protected class; (2) she was qualified for the
position she held; (3) she suffered an adverse employment action;
and (4) the circumstances of the adverse action give rise to an
inference of discrimination.  <u>See</u> <u>Burdine</u>, 450 U.S. at 254 n.6;
<u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 410-11 (3d
Cir. 1999).  There is no question that Killen is a member of a
protected class and defendants do not challenge Killen's

qualifications for the job she held.  We will, therefore, focus our attention on the third and fourth elements of the test.

There is, of course, no doubt that Killen suffered an adverse employment action when she was terminated.  It is, however, less clear whether NHS's decision to place Killen on administrative leave was an adverse action as she claims. Although our Court of Appeals has not addressed this issue,[13] those courts of appeals that have done so have found that placing an employee on paid administrative leave[14] where there is no presumption of termination is not an adverse action for discrimination purposes.  See Joseph v. Leavitt, 465 F.3d 87, 90-91 (2d Cir. 2006) (finding that placing an employee on administrative leave is not an adverse employment action and citing cases from the Fourth, Fifth, Sixth, and Eighth Circuits reaching the same result).[15]  These courts have found that

---

[13] Indeed, this appears to be an issue of first impression within the Third Circuit as we can find no district court case addressing it either.

[14] Killen would have been paid for her time on administrative leave had NHS determined that the allegations of wrongdoing were baseless.  It is, therefore, reasonable to consider her situation prior to NHS's decision to terminate her as paid administrative leave.

[15] Some courts of appeals have reached a different result in the retaliation context, applying the Supreme Court's recent decision in Burlington Northern and Santa Fe Ry. Co. v.
(continued...)

administrative leave, when used in accordance with an employer's
disciplinary policy,[16] does not alter the terms, conditions, or
benefits of employment. Id. at 91. We agree with those courts,
and find that placing an employee on paid administrative leave
pending an investigation is not, without more,[17] an adverse
employment action adequate to support a discrimination claim.

Thus, with regard to her discrimination claim, Killen
did not suffer an adverse employment action until September 19,
2005 when Schlemmer sent the letter notifying her that her
employment was being terminated.

To make out a prima facie case, Killen must also show
circumstances surrounding her termination that give rise to an
inference of discrimination. This she has failed to do. She has
advanced no evidence that Washington, the only person who Killen

---

[15](...continued)
White, 126 S. Ct. 2405 (2006), which found a lower threshold for
an adverse employment action in the retaliation context. See,
e.g., Michael v. Caterpillar Fin. Svcs. Corp., --- F.3d ----,
2007 WL 2176220 (6th Cir. July 31, 2007). We will address those
issues when we examine Killen's retaliation claim.

[16] Killen does not allege that NHS's decision to place
her on administrative leave was inconsistent with its
disciplinary procedures.

[17] The situation might be different where an employer
fails to complete its investigation in a reasonable time, leaving
the employee in limbo unnecessarily. Although Killen attempts to
cast doubt on Dougherty's findings, there is no basis to conclude
that his investigation was unreasonably protracted or delayed.

alleges demonstrated overt racial animus towards her, had any role in the decision to terminate her or place her on administrative leave.  She also has not presented evidence of any white employees who were treated more favorably than she was in similar circumstances.[18]  Indeed, despite the nearly four pages in their brief that defendants devote to arguing that Killen has not made out a _prima facie_ case of discrimination, Killen's entire argument on this vital issue consists of a single conclusory sentence that supports no inference of discrimination in the decision to terminate.[19]  See Pl. Resp. at 12-13.

Even if Killen were able to make out a _prima facie_ case of discrimination, NHS would then have an opportunity to offer a legitimate, non-discriminatory reason for its decision to terminate Killen.  Not surprisingly, NHS claims that it fired Killen because of allegations of financial impropriety that

---

[18] At her deposition, Killen testified that she was not aware of any similarly-situated employees who were treated more favorably than she was.  Killen Dep. at 106:2-107:11.

[19] Killen claims to have "raised doubt as to the reasons for her firing."  Id. at 13.  Even if she has done so, that is not sufficient.  At this stage, a plaintiff must do more than cast doubt on the employer's proffered reason for termination; she must offer some evidence from which an affirmative inference of discrimination could reasonably be made.  Even taking her evidence in the best possible light, she has only offered evidence that is in conflict with NHS's proffered explanation.  That does not, by itself, create an inference of racial discrimination sufficient to make out a _prima facie_ case.

Dougherty's audit confirmed.  Once NHS has articulated a legitimate reason, the burden returns to Killen, "who must now show by a preponderance of the evidence that the employer's explanation is pretextual." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).  Because we address this case at summary judgment, not at trial, Killen's burden is to produce evidence from which a reasonable factfinder <u>could</u> find that NHS's proffered reason is a pretext for discrimination.

The only evidence of pretext that Killen points to in her brief is her own testimony that she had permission from Schlemmer to create the contingency fund and that the ten $1,000 cashier's checks from LB's account were all used to pay his legitimate expenses.  Dougherty's audit also found more than $40,000 in missing rent payments and undocumented disbursements of $2,330 from another client's account for which Killen offers no explanation.  Even if a jury credited Killen's testimony[20] as to the contingency fund and LB's account, Dougherty's other findings would still be a more than adequate justification for NHS's decision to discharge her.  On the basis of the paltry evidence Killen provides, no reasonable juror could find that she

_____

[20] Killen offers no evidence other than her own testimony to support her contention that the disbursements were legitimate.  Although the testimony mentions a log that Killen created, that document has not been provided to us.

had proven by a preponderance of the evidence that NHS's assertion that it fired her due to financial improprieties was pretextual.

Because we find that Killen has carried neither of her burdens under McDonnell-Douglas, we must grant NHS's motion as to the disparate treatment claim.

B.   Hostile Environment Harassment

In Forklift Systems, the Supreme Court reaffirmed its holding in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986), that 42 U.S.C. § 2000e-2(a)(1)'s prohibition on discrimination "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" encompassed "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." 510 U.S. at 21 (internal quotations omitted).  In order to make out a claim for hostile environment harassment, Killen "must prove that (1) she suffered intentional discrimination because of her protected [class status]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in

like circumstances; and (5) a basis for employer liability is present." Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled on other grounds by Burlington Northern (footnotes omitted). In the end, Killen must show "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting Vance v. S. Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989) (emphasis omitted)).

   The first question on this count is whether Washington's comments to Killen, if proven, would be sufficiently "severe or pervasive" to support a hostile environment claim. In assessing this, we must remember that hostile environment harassment arises out of the Supreme Court's finding that if it is sufficiently severe or pervasive, harassment can alter the terms of employment in violation of Section 2000e-2(a)(1). Thus, "to be actionable, [harassment] must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor, 477 U.S. at 67 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). Meritor specifically distinguished this severe or pervasive harassment from "mere utterance of an ethnic or racial

epithet which engenders offensive feelings in an employee." Id.
(quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1972)).

While Killen is correct that even a single incident can
create a hostile work environment if it is sufficiently severe,
see, e.g., Moring v. Ark. Dep't of Corr., 243 F.3d 452, 456-57
(8th Cir. 2001), the incidents alleged here do not rise to that
level.[21]  "[I]solated incidents (unless extremely serious) will
not amount to discriminatory changes in the 'terms and conditions
of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775,
788 (1998).  Washington's alleged comments, though offensive, are
not sufficiently severe -- especially given their brief duration
-- that they can fairly be said to alter the terms of Killen's
employment.

In addition, Killen has not shown that Washington's
comments would have severely affected a reasonable employee in
her position.  Indeed, Kulo and Webb, who were present at the

---

[21] To put things in perspective, the allegations in
Moring were as follows: "Mr. Smith was Ms. Moring's supervisor.
They were on an overnight business trip.  He suggested that she
might not be safe in her hotel room, or that they might be the
object of animosity from the people at Calico Rock.  He knocked
on Ms. Moring's door clothed only in boxer shorts.  After
entering her room he repeatedly insisted that Ms. Moring 'owed'
him for her job.  He would not leave the hotel room, although Ms.
Moring repeatedly asked him to leave.  Finally, he sat on her
bed, touched her thigh and leaned in as if to kiss her." Id.
The allegations here cannot fairly be compared with those in
Moring.

lunch during which the majority of the comments appear to have been made, did not find Washington's comments offensive or even memorable.  Both, in fact, offer affidavits that, although they remember the conversation about light-skinned and dark-skinned people of African descent, they could not remember Washington commenting about the company's preference for lighter-skinned people in corporate positions.  Def. Mot., ex. D ¶¶ 16-19; ex. G ¶¶ 16-17.

Finally, Killen provides no basis for NHS's <u>respondeat</u> <u>superior</u> liability for Washington's alleged harassment.  The evidence is uncontroverted that Washington was not Killen's supervisor.  Killen provides no other basis why we should consider her to be "within that class of an employer organization's officials who may be treated as the organization's proxy."  <u>Faragher</u>, 524 U.S. at 789.

For all of these reasons, Killen's harassment claim must fail.

### C.   <u>Retaliation</u>

Killen's third claim under Title VII is for retaliation.  42 U.S.C. § 2000e-3 is Title VII's prohibition of retaliation and reads:  "It shall be an unlawful employment practice for an employer to discriminate against any of his

employees . . . because [the employee] has opposed any practice

made an unlawful employment practice by this subchapter, or

because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or

hearing under this subchapter." The Supreme Court has found

that, in order to give effect to Congress's intent, this

provision's prohibition is to be interpreted more broadly than

that of the core anti-discrimination provision. See Burlington

Northern, 126 S. Ct. at 2411-12.

        To establish a prima facie case of retaliation under

Title VII, Killen must show that:  (1) she engaged in conduct

protected by Title VII; (2) after or contemporaneous with that

conduct, her employer took a materially adverse action against

her; and (3) her participation in the protected activity and the

adverse employment action were causally linked. Hare v. Potter,

220 Fed. Appx. 120, 127 (3d Cir. 2007) (non-precedential) (citing

Burlington Northern, 126 S. Ct. at 2415). A materially adverse

action is one that "well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination."

Burlington Northern, 126 S. Ct. at 2415 (internal quotation

omitted).

        As to the first element of the test, there can be no

question that Killen's complaints, both to Schlemmer and to the

compliance hotline, are protected activity.  Our Court of Appeals
has made clear that "we do not require a formal letter of
complaint to an employer or the EEOC as the only acceptable
indicia of the requisite 'protected conduct.'" Barber v. CSX
Distrib. Svcs., 68 F.3d 694, 702 (3d Cir. 1995).  Protected
activity may also include "informal protests of discriminatory
employment practices, including making complaints to management,
writing critical letters to customers, protesting against
discrimination by industry or society in general, and expressing
support of co-workers who have filed formal charges."  Id.
(quoting Sumner v. United States Postal Serv., 899 F.2d 203, 209
(2d Cir. 1990)).  Here, where Killen made reports to her
employer's compliance hotline and to her supervisor, we think it
clear that her activity was protected.

        With regard to a materially adverse employment action,
it is again obvious that her termination qualifies.  Because
Killen relies in large part on temporal proximity to establish
her causal link, however, it is important to her case that the
decision to place her on administrative leave also be considered
an adverse employment action.  As the Sixth Circuit has observed,
Burlington Northern's broad definition of what is materially
adverse in the retaliation context "permits actions not
materially adverse for purposes of an anti-discrimination claim

to qualify as such in the retaliation context." <u>Michael</u>, 2007 WL 2176220 at *8.  That court concluded that placing an employee on paid administrative leave and placing her on a performance plan were materially adverse employment actions for purposes of a retaliation claim.  <u>Id.</u>  We find that the threat of placement on administrative leave and the threat of a formal audit could have dissuaded a reasonable employee from making a discrimination claim.  Being placed on administrative leave is potentially embarrassing and a reasonable employee, even one who believes she has followed proper procedures, might avoid making waves if she feared a painstaking audit of her financial dealings would result.[22]  They are, therefore, materially adverse actions for purposes of Killen's retaliation claim.[23]

The final requirement to make out a <u>prima facie</u> case is that Killen must demonstrate some causal link between her complaint and her being investigated and placed on administrative leave.  Killen's claim of a causal link is primarily based on the closeness in time of her complaint and her being placed on

---

[22] One need only look at the fear (and loathing) with which most taxpayers look on IRS auditors, or the mere prospect of an audit, to confirm this.

[23] Killen cannot claim that Washington's audit itself was undertaken with a retaliatory motive.  Because that audit took place before any protected action on her part, it cannot serve as the basis for Killen's retaliation claim.

administrative leave.  Our Court of Appeals has recognized that "a suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation."  <u>Thomas v. Town of Hammonton</u>, 351 F.3d 108, 114 (3d Cir. 2003).  Here, Killen made two anonymous reports, the first one some time between April 22 and May 2 and the second on May 27.[24]  The decision to place her on administrative leave was made on June 8 and she was notified of that decision on June 13.  While, if we are to find causation from temporal proximity alone, that timing might permit some inference of causation, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred."  <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 512 (3d Cir. 2003) (internal quotations omitted).  Here, where several weeks elapsed between Killen's complaint and any adverse action, we cannot find that the timing is "unusually suggestive."

Because the timing is not unusually suggestive, Killen must produce some other evidence to support a causal link.  Typically, in the absence of strong temporal evidence of a causal link, plaintiffs rely on "antagonistic conduct or animus"

---

[24] She also complained to Schlemmer on June 13.  Because, however, the undisputed record evidence shows that the decision to place Killen on leave was made on June 8, her June 13 complaint cannot have been a factor in that decision.

23

directed at the employee during the intervening time, or "other
types of circumstantial evidence, such as inconsistent reasons
given by the employer for terminating the employee or the
employer's treatment of other employees, that give rise to an
inference of causation when considered as a whole." Marra v.
Philadelphia Housing Auth., --- F.3d ----, 2007 WL 2215603 (3d
Cir. Aug. 2, 2007) at *10.  Killen has produced no such evidence.
Indeed, she does not even have any evidence that the
decisionmakers were aware of her anonymous complaints when they
reached their decision to place her on administrative leave.
While it is not strictly necessary for Killen to prove that the
decisionmakers were aware of her protected activity when they
made their decision, we see no way that, on this record, a
reasonable juror could infer a causal relationship between
Killen's complaint and the decision to place her on
administrative leave.  Although Schlemmer was aware of Killen's
complaint by June 13, where a decision is contemplated prior to
the decisionmakers' becoming aware of the protected activity, no
inference of causality is warranted.  See Clark County Sch. Dist.
v. Breeden, 532 U.S. 268, 272 (2001).[25]

_____

> [25] Even were there not a Supreme Court holding on
> point, this would obviously be the only reasonable result since a
> contrary holding "might impede employers from permissible
>                                             (continued...)

Killen also points to Dougherty's audit itself as an adverse action in response to her complaint.  Certainly, being subjected to an intrusive audit of this sort is the kind of threat that would lead a reasonable employee not to complain. Again, however, Killen has no evidence that links her complaint to either the decision to perform the audit or its results. Killen merely states that "Dougherty admitted that he knew of the complaints during his investigation" and then jumps, without further explanation, to "[t]hese acts, in their context, appear to flow from the date of the complaint." Pl. Mem. at 21.  While the fact that Dougherty knew of her complaint is probative, it is not sufficient to demonstrate a link.  In the absence of any other link, no reasonable juror could find on this evidence that Killen has made out a <u>prima</u> <u>facie</u> case of retaliation.

Further, even if Killen could make out her case at this stage, NHS has the opportunity to identify a legitimate reason for its actions.  The decision to place Killen on administrative leave and commence the formal audit was made on the basis of the telephone complaints about Killen's handling of funds and

---

[25](...continued)
terminations and encourage employees aware of an impending termination to attempt to create their own 'severance package.'" <u>Windfelder v. May Dep't Stores Co.</u>, 93 Fed. Appx. 351, 355 (3d Cir. 2004) (non-precedential).

Washington's report.[26]  The decision to terminate Killen was
based on the results of Dougherty's audit, which, as we discussed
above, found a number of significant discrepancies.  Our Court of
Appeals has noted that there is a "close similarity" between the
causation analysis at this stage and the proof of causation
required to demonstrate a prima facie case.  Marra, 2007 WL
2215603 at *10 n.13.  Although we have already found that Killen
has failed to produce sufficient evidence to support her prima
facie case, we will examine the additional allegations that she
brings forth at this stage.

Killen claims to present evidence that Dougherty was
aware of her complaints at the time he completed his report,[27]
see Dougherty Dep. at 90:2-7, but she cites no evidence that
Dougherty's report was influenced in any way by that knowledge.
Further, although she attacks some of his findings, as we noted
above, she provides no explanation for the more than $40,000 in
missing rent, which would itself have been an adequate ground for

---

[26] Even if, as Killen claims, Washington's report was
colored by her racial animus, Schlemmer and her superiors, who
had no knowledge of Washington's alleged racial harassment, were
entitled to rely on that report in making their decision.

[27] Actually, in the passage Killen cites, Dougherty
says only that he was aware of her complaint in November, 2005
when he spoke to NHS counsel about referring the matter to law
enforcement.

NHS's decision to fire her.  Thus, even if Killen had carried her burden of proving a prima facie case of discrimination, no reasonable juror could find that NHS's proffered legitimate reason for Killen's dismissal was pretextual.  Killen's retaliation claim, therefore, also fails.

D.   Intentional Infliction of Emotional Distress

Killen's final claim, brought under Pennsylvania law, is for intentional infliction of emotional distress ("IIED"). NHS claims both that Washington's actions are insufficiently outrageous to trigger an IIED claim, and that Killen's claim is preempted by the Pennsylvania Worker's Compensation Act ("WCA"), 77 Pa. Stat. Ann. §§ 411, et seq.

The Pennsylvania Supreme Court has defined IIED, in relevant part, as follows:  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. . . ."  Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998) (quoting Restatement (Second) of Torts § 46(1)).  The court then went on to note that a claim for IIED is supported in cases that present "only the most egregious conduct."  Id. at 754.  In the employment context, the court found that harassment alone was not, as a rule, sufficient to support an IIED claim and concluded

that "retaliation is a critical and prominent factor in assessing the outrageousness of an employer's conduct." Id. Our Court of Appeals, interpreting Pennsylvania law, noted that it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988).

In Bowersox v. P.H. Glatfelter Co., 677 F. Supp. 307, 311 (M.D. Pa. 1988) (internal quotation omitted), the case on which Killen predicates her IIED claim, Judge Rambo found that although the harassing conduct of plaintiff's supervisor was "insulting, undignified, annoying, and perhaps representative of the rough edges of our society," it did not by itself constitute the sort of "extreme and outrageous conduct" that would support an IIED claim. It was only the supervisor's subsequent retaliation for plaintiff's rejection of his sexual advances that allowed her to proceed with her claim for IIED.

Killen also cites to Merritt v. Del. River Port Auth., 1999 WL 285900, (E.D. Pa. Apr. 20, 1999) (Padova, J.) as an example of a case in which this Court found that a claim for IIED in the employment context could survive a motion for summary judgment. In that case, plaintiff John Merritt produced record

28

evidence that, over a period of nine months, one of his co-
workers "repeatedly exposed himself to Merritt, touched Merritt's
genitals on many occasions, and engaged in masturbation while
calling out Merritt's name." Id. at *8. When plaintiff
approached his supervisor to complain, he was met with laughter,
inaction, and attempts to cover up the offensive conduct. Judge
Padova concluded that "this may well be the rare case alluded to
in Hoy where the conduct . . . is so outrageous that it offends
all notions of decency and should be regarded as atrocious and
utterly intolerable in a civilized society." Id.

Without minimizing the degree to which Washington's
conduct offended and injured Killen, it is simply not comparable
with the situations in which courts have sustained IIED claims by
employees against their employers. Further, unlike the employer
in Merritt, Killen has presented no evidence that NHS failed to
take her complaint seriously. Every indication is that they
conducted a thorough investigation. That the investigation found
no wrongdoing is not, standing alone, probative of a failure to
take Killen's claim seriously.

Though Hoy allowed for the possibility that an IIED
claim against an employer could be proven absent retaliation,
such a finding was reserved only for a situation in which that
harassing conduct was "blatantly abhorrent." 720 A.2d at 754.

We do not entirely rule out the possibility, but it is difficult to imagine a set of facts that would be "blatantly abhorrent" for purposes of an IIED claim without also being "severe or pervasive" for purposes of a Title VII harassment claim. If such facts exist, they are not present in this case. Having already found that Washington's actions were inadequate to support a Title VII harassment claim and that there is no proof of retaliation, we are convinced that Washington's actions do not meet the "blatantly abhorrent" standard the Pennsylvania Supreme Court established.

Because we find that Killen's claim is insufficient on its face to withstand defendants' motion, we need not address in detail defendants' claim that the WCA bars the claim. We note, however, that while courts have occasionally allowed particularly egregious sexual harassment claims to avoid preemption on the grounds of the so-called "third-party attack" exception for personal attacks directed at employees, see Merritt, 1999 WL 285900 at *8 n.6 (citing cases), Killen points to no cases, nor does our own research reveal any, in which a claim for IIED based on allegations of racial harassment has been allowed to survive summary judgment and go to trial. While this is not dispositive, it suggests that courts are less willing to allow IIED claims to go forward in the racial harassment context than in the sexual

harassment context.   The proven allegations here are not, as we have mentioned above, so egregious as to convince us to ignore this trend and allow Killen's suit to proceed.

Having found that Killen has failed to produce sufficient evidence to withstand summary judgment on any of her claims, we will grant NHS's motion and enter judgment in favor of defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHANDA S. KILLEN            :      CIVIL ACTION
                           :
            v.             :
                           :
NORTHWESTERN HUMAN SERVICES, :
    INC., et al.           :      NO. 06-4100

ORDER

AND NOW, this 7th day of September, 2007, upon consideration of defendants' motion for summary judgment (docket entry # 19) and plaintiff's response (docket entry # 22) and for the reasons discussed in the accompanying memorandum, it is hereby ORDERED that:

1.    Defendants' motion is GRANTED; and

2.    The Clerk of Court shall CLOSE this matter statistically.

BY THE COURT:

_____
Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHANDA S. KILLEN               :      CIVIL ACTION
                               :
          v.                   :
                               :
NORTHWESTERN HUMAN SERVICES,   :
    INC., et al.               :      NO. 06-4100

## JUDGMENT

AND NOW, this 7th day of September, 2007, in accordance with the accompanying Memorandum and Order and the Court having this day granted defendants' motion for summary judgment, JUDGMENT IS ENTERED in favor of defendants Northwestern Human Services, Inc. and Northwestern Human Services of Delaware County and against plaintiff Shanda S. Killen.

BY THE COURT:


_____
Stewart Dalzell, J.